**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IMRAN FAYYAZ, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:20-CV-01570 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| UHS OF HARTGROVE, INC., d/b/a | ) | |
| HARTGROVE HOSPITAL, and STEVEN | ) | |
| AIRHART, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Imran Fayyaz brings this employment discrimination lawsuit against his for-
mer employer, UHS of Hartgrove, Inc. (which does business as Hartgrove Hospital),
and its CEO, Steven Airhart (for convenience's sake, the Defendants will be collec-
tively called UHS).[1] R. 1, Compl.[2] Fayyaz claims that UHS discriminated against him
based on his disability in violation of the Americans with Disabilities Act (commonly
referred to as the ADA), 42 U.S.C. § 12101 *et seq.* Fayyaz also argues that UHS retal-
iated against him for exercising his rights under the Family and Medical Leave Act
(commonly referred to as the FMLA), 29 U.S.C. § 2601 *et seq.*[3] UHS has moved for

---

[1]The Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331.

[2]Citations to the record are "R." followed by the docket entry number and, if needed,
a page or paragraph number.

[3]Fayyaz withdrew his disability-harassment and FMLA-interference claims. *See* Pl.'s
Br. at 11, n.2; 13, n.3. Fayyaz's failure to respond to arguments advanced by UHS results in
forfeiture of those claims at summary judgment. *Citizens for Appropriate Rural Roads v.
Foxx*, 815 F.3d 1068, 1078 (7th Cir. 2016) (citing cases).

summary judgment on all claims. R. 39. For the reasons discussed in this Opinion, the motion is granted in part and denied in part.

## I. Background

In deciding UHS's motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The facts below are undisputed unless otherwise noted.

Fayyaz was employed as a Group Human Resources Director for UHS from April 2017 through January 2019. DSOF ¶ 2.[4] As an HR Director, Fayyaz was responsible for human-resources functions for Hartgrove Hospital and Garfield Park Hospital. *Id.* . He served on Hartgrove's Executive Team, which included around 10 members. *Id.* ¶ 9. One of Fayyaz's major responsibilities was to ensure that both hospitals' HR Departments were prepared for a tri-annual survey. *Id.* ¶ 11–12. The survey is conducted by an entity called The Joint Commission, which audits and determines the accreditation of various hospitals. *Id.*

In late September 2018, Fayyaz was involved in a car accident that resulted in a diagnosis of post-concussion syndrome. DSOF ¶ 17. He experienced daily symptoms of photosensitivity, difficulty with hearing, difficulty with focusing, and headaches.

---

[4]Citations to the parties' Local Rule 56.1 Statements of Fact are "DSOF" (for UHS's Statement of Facts) [R. 41]; "PSOAF" (for Fayyaz's Statement of Additional Facts) [R. 46]; "Pl.'s Resp. DSOF" (for Fayyaz's response to UHS's Statement of Facts) [R. 46]; and "Defs.' Resp. PSOAF" (for UHS's Response to Fayyaz's Statement of Additional Facts) [R. 48], followed by the paragraph number.

DSOF ¶¶ 17, 50, 51; PSOAF ¶¶ 13–14; *see* R. 41-2, Def.'s Exh. 1, Fayyaz Dep. at 307:13–308:9. He requested and was granted FMLA leave by Sedgwick Absence Management (which is a third-party leave administrator for UHS and other client companies) from September 2018 through October 2018. DSOF ¶¶ 18–19.

On October 8, 2018, The Joint Commission conducted a surprise tri-annual survey at Hartgrove Hospital. DSOF ¶ 20. Prior to the survey, CEO Airhart had observed serious issues with the HR Department, including missing and disorganized files. *Id.* ¶¶ 21–25. This led Airhart to feel frustrated with Fayyaz because of the team's lack of preparation. *Id.* ¶ 26. Nonetheless, Hartgrove ultimately passed the survey. *Id.*

In late October 2018, Airhart and Fayyaz spoke over the phone about the department's poor performance in preparing for the The Joint Commission survey. DSOF ¶ 32. The parties dispute whether Airhart said Fayyaz was an "embarrassment *to* him," *see* PSOAF ¶ 24 (emphasis added), or whether Airhart told Fayyaz the department's performance "embarrassed him," *see* DSOF ¶ 32. (Fayyaz's version must be credited at this stage.) During this call, Airhart told Fayyaz there was "unofficial wagering" by members of the executive team on whether Fayyaz would return to work or was looking for a new position elsewhere. PSOAF ¶ 26; R. 41-4, Def.'s Exh. 3, Airhart Dep. at 172:23–173:5. Fayyaz never said anything to suggest that he was not returning to work. PSOAF ¶ 27; Airhart Dep. at 178:7–9. Nevertheless, Airhart believed that the executive team members were speculating about Fayyaz's return because Fayyaz had requested FMLA leave extensions. PSOAF ¶ 27; Airhart Dep. at

3

179:9–180:1. After receiving two FMLA leave extensions, Fayyaz ultimately returned to work in November 2018 without any disability accommodations. DSOF ¶ 34.

In early January 2019, UHS began preparing for a mock survey to take place on January 8 at Garfield Park Hospital. DSOF ¶¶ 37–39. Airhart corresponded with members of the executive team, complaining that he was "stunned to see so many [GPH employee] files still appearing to be grossly deficient" and that he would "expect full compliance as assured [to] me by Imran." *Id.* ¶ 38. The parties dispute the degree of these deficiencies and whether they were resolved by the January 8 mock survey. DSOF ¶ 39; Pl.'s Resp. DSOF ¶ 39.

The day before the mock survey, Fayyaz reached out to Sedgwick to take additional FMLA leave. DSOF ¶ 61. As late as January 7, 2019, Fayyaz reported experiencing headaches about three times per week. PSOAF ¶ 20. Indeed, to this day he reports continued headaches, photo sensitivity, and issues with his concentration and focus. *Id.* ¶ 23. The parties dispute when Fayyaz spoke to Airhart about taking this additional FMLA leave: Fayyaz asserts that they talked on January 8, the day before Fayyaz was fired, *id.* ¶ 30, while UHS contends that this conversation took place much earlier, specifically "shortly after" Fayyaz returned to work in November 2018, DSOF ¶ 62. The parties also dispute whether Airhart replied "oh, shit" when Fayyaz told Airhart about the additional leave. DSOF ¶ 63; Pl.'s Resp. DSOF ¶ 63.

In any event, Linda Simko, Corporate Clinical Services Director and conductor of the survey, voiced concerns about Human Resources to Airhart after the mock survey concluded. DSOF ¶ 39. Airhart discussed the issue with members of his team and

4

agreed to demote Fayyaz to HR Director overseeing only Garfield Park Hospital (instead of both that hospital plus Hartgrove). DSOF ¶ 40. The next day, on January 9, Airhart met with Fayyaz to discuss his demotion and the mock-survey findings. *Id.* ¶ 41. Airhart did not intend to terminate Fayyaz before this meeting. *Id.* ¶ 42. During the meeting, however, Fayyaz was not willing to take responsibility for his department's performance issues. *Id.* ¶ 43. He became increasingly argumentative, defensive, and distant from the issue. *Id.* Simko, a witness at the meeting, reports Fayyaz's demeanor was "nonchalant, disrespectful, and insubordinate." *Id.* ¶ 47. Fayyaz was ultimately fired during the meeting. *Id.* ¶ 44.

Fayyaz eventually filed this lawsuit. During the course of discovery, UHS uncovered information about omissions in Fayyaz's employment application (that is, the application that Fayyaz submitted before he was hired). DSOF ¶¶ 65–69. UHS also discovered errors made by Fayyaz concerning his failure to ensure that UHS followed the Illinois Biometric Information Privacy Act's requirements. *Id.* ¶¶ 70–75. According to UHS, Fayyaz would have been terminated for these omissions and errors in either February 2019 or, at the latest, March 2020. *Id.* ¶¶ 69, 76.

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating

5

summary judgment motions, courts must view the facts and draw reasonable infer-ences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judg-ment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Fayyaz's Declaration

Before getting to the merits, there is a threshold dispute over whether to dis-regard certain facts averred to in Fayyaz's Declaration, which was filed with his sum-mary judgment response. According to the defense, the additional facts are "self-serv-ing, conclusory, contain[] inadmissible evidentiary statements," and are inconsistent with Fayyaz's prior deposition testimony. R. 47, Defs.' Reply at 2.

Under Civil Rule 56, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the mat-ters stated." Fed. R. Civ. P. 56(c)(4). Admissibility is a threshold issue because "a

6

court may consider only admissible evidence in assessing a motion for summary judgment." *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). So a party cannot rely on bare, conclusory allegations. *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010). But it is crucial to note that there is absolutely nothing wrong, standing alone, with a so-called "self-serving" fact. *Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013). Facts offered by one side against the other will *of course* favor the proponent of the evidence.

But an affidavit cannot try to fix a prior, under-oath inconsistency without a plausible explanation. "As a general rule, a party may not create an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony in the absence of newly-discovered evidence or the unmistakable need to clarify prior ambiguous statements." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 688 n. 5 (7th Cir. 2008) (cleaned up).[5] But "[i]t is less obvious when ... the 'new' statement adds to, without directly contradicting, prior testimony although the prior testimony is perfectly clear." *Id.* Indeed, it is well-settled that a party opposing summary judgment "may attempt to clarify or augment (but not contradict) prior deposition testimony through affidavits." *Simmons v. Chicago Bd. of Educ.*, 289 F.3d 488, 492 (7th Cir. 2002) (cleaned up).

---

[5]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

Here, UHS contends that Paragraphs 1 and 2 in Fayyaz's declaration are "immaterial, conclusory, and his unauthenticated medical records are inadmissible hearsay." Defs.' Reply at 3. In Paragraph 1, Fayyaz avers that before the car accident in September 2019, he had "never suffered" from post-concussion symptoms such as migraine headaches and photosensitivity. R. 46-2, Pl.'s Exh. 1, Fayyaz Decl. ¶ 1. Where testimony is based on personal knowledge or firsthand experience, the testimony is admissible evidence of a disputed material fact—even if it is otherwise uncorroborated or self-serving (which, again, is not a valid criticism of evidence). *Montgomery*, 626 F.3d at 389 (cleaned up). Fayyaz has personal knowledge of his symptom history, so there is nothing wrong with Paragraph 1.

For Paragraph 2, Fayyaz attaches to his declaration "selected portions" of his medical records from September 2018 through January 2019. Fayyaz Decl. ¶ 2. It is true that unauthenticated medical records are generally inadmissible. *Briggs v. Marshall*, 93 F.3d 355, 362 (7th Cir. 1996). But the "very act of production [is] implicit authentication." *United States v. Brown*, 688 F.2d 1112, 1116 (7th Cir. 1982); *see* Fed. R. Evid. 901(b)(1). In *Brown*, the Court held the government's business records had been authenticated where the defendant produced them for a grand jury proceeding and attributed the source of the documents to the corporation of which his client was an officer. *Id.* The Seventh Circuit reasoned, "[a]uthentication relates only to whether the documents originated from [their source]; it is not synonymous to vouching for the accuracy of the information contained in those records." *Id.* Although UHS disputes the completeness of Fayyaz's medical records, UHS does *not* raise any specific

8

arguments that these records are not genuine or that they were not previously disclosed. *See* Defs.' Resp. PSOAF at 10–14.[6] In effect, UHS is arguing for a rule that would require affiants to also attach a Rule 902(11) certificate to any exhibits, even medical records that no one can say, in good faith, are not authentic. Sure, as a matter of practice, every litigant ought to ask for a 902(11) certificate from every records custodian, and then attach it as part of the summary judgment record. But legion summary judgment filings do not do that for the vast majority of records, that is, the records for which there is no genuine authenticity objection. Under the circumstances here, the medical-records exhibit to the declaration is acceptable.

UHS further moves to strike Paragraph 3 of Fayyaz's declaration on the basis that it contradicts Fayyaz's previous deposition testimony. Defs.' Reply at 3. Generally, the Seventh Circuit does not permit "a party to create an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony." *Hickey v. Protective Life Corp.*, 988 F.3d 380, 389 (7th Cir. 2021) (cleaned up). "However, supplemental affidavits can be employed to clarify ambiguous or confusing deposition testimony." *Buckner v. Sam's Club, Inc.*, 75 F.3d 290, 292 (7th Cir. 1996). Here, in Paragraph 3, Fayyaz avers—unequivocally—that he met with Airhart on

---

[6]UHS cites two cases to support its contention that unauthenticated medical records are inadmissible. Defs.' Resp. PSOAF at 10; *see Robbins v. Lappin*, 170 F. App'x 962, 963-64 (7th Cir. 2006); *Starchvill v. Dart*, 2018 WL 3456525, at *5 (N.D. Ill. July 18, 2018). The Court first notes that *Robbins*, issued in 2006, provides no guidance in this case—it is not even citable. Seventh Circuit Rule 32.1 bars citation of any order issued before January 1, 2007 (with inapplicable exceptions). Seventh Cir. Rule 32.1(b), (d). *Starchvill*, an unpublished opinion, is also distinguishable. The district court there did not discuss if the disputed document passed Rule 901(b)(1) or if it analyzed issues related to the document's provenance. *Starchvill*, 2018 WL 3456525, at *5.

9

January 8, 2019, which was the day after he contacted Sedgwick about taking intermittent FMLA leave. Fayyaz Decl. ¶ 3. Fayyaz asserts that Airhart responded "Oh shit" after Fayyaz reported that he was taking additional leave. *Id.* The problem with the now-unequivocal assertion that January 8, 2019, was the precise date of the conversation is that Fayyaz repeatedly disclaimed remembering the date during his deposition testimony. *See e.g.,* Fayyaz Dep. at 323:1–323:3 ("November 2018 or December 2018? Whenever I returned. Again, I don't recall but shortly after I returned."); *id.* at 429:8–13 ("Okay. Well, was it in December? ... Was it in January? Again, I don't recall exactly when."). Fayyaz has not offered an explanation, let alone "a plausible explanation[,] for the discrepancy" between his earlier testimony and the declaration. *Kalis v. Colgate-Palmolive Co.*, 231 F.3d 1049, 1054 (7th Cir. 2000). He offers no information on what jogged his memory or caused him to remember that it was January 2019 (instead of November or December 2018) when he spoke with Airhart. So the specific date in Paragraph 3 of Fayyaz's declaration must be disregarded.

Next, UHS argues that the statements on Fayyaz's current symptoms of his post-concussion syndrome—as opposed to his symptoms at the time of his termination—are immaterial. Defs.' Reply at 3. In the declaration, Fayyaz says that he "continue[s] to suffer from many of the same symptoms" that he suffered immediately after the accident. Fayyaz Decl. ¶ 4. These statements are admissible based on his personal knowledge, not speculation or conjecture. *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999). To the extent his current symptoms are different from those Fayyaz experienced preceding his termination, (1) Fayyaz explicitly states that he

10

*continues* to suffer from the same symptoms and (2) any critique of that assertion's relevance to what he felt at the time of the firing goes to the weight, not the admissibility, of the evidence.

Finally, UHS asserts that Paragraph 7 of Fayyaz's declaration should be disregarded because "his legal conclusion, conjecture and 'belief'" is inadmissible. Defs.' Reply at 4. In Paragraph 7, Fayyaz first says, "Airhart fired me the day after I told him I was seeking intermittent FMLA leave." Fayyaz Decl. ¶ 7. To the extent that this statements attempts to smuggle in the January 8 date of the FMLA-leave conversation, which the Court rejected above, this statement must be disregarded. Fayyaz next says, in the same paragraph, "I believe I was fired not for performance reasons but because I was disabled and sought FMLA leave." *Id.* This statement indeed is a legal conclusion, and thus has no bearing on the factual analysis. *See Greene v. Westfield Ins. Co.*, 963 F.3d 619, 627 (7th Cir. 2020). All other statements made in Fayyaz's declaration may be considered in evaluating the summary judgment motion.

## IV. Analysis

Moving on to the merits, three issues are in play. First is Fayyaz's disability-discrimination claim. Fayyaz alleges that UHS discharged him based on his disability, which he suffered as a result of his accident. *See* PSOAF ¶¶ 8, 12–15, 23, 24–27. Second is Fayyaz's FMLA-retaliation claim. Fayyaz asserts that UHS fired him based on his intent to seek intermittent FMLA leave. *Id.* Lastly, the Court examines the parties' dispute over whether (and to what extent) the after-acquired evidence doctrine applies to both claims. *See* Defs.' Br. at 14–15; Pl.'s Br. at 14; Defs.' Reply at 15.

11

## A. ADA Disability Discrimination

"The ADA prohibits an employer from discriminating against a qualified person on the basis of disability." *McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 789 (7th Cir. 2019). The elements of a disability-discrimination claim require the plaintiff to show that he was (1) disabled within the meaning of the ADA; (2) was qualified to perform his job; and (3) suffered an adverse employment action because of his disability. *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 961 (7th Cir. 2021). Although Fayyaz readily shows a genuine issue on whether he is disabled under the ADA, he is unable to show either that he was otherwise qualified to perform his job or a causal link between his disability and termination.

### 1. Disability

To succeed on a disability-discrimination claim, a plaintiff must prove that he is disabled. *Igasaki,* 988 F.3d at 961. A disability is defined as "(A) a physical or mental impairment that substantially limits one or more major life activities of the individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102.

Fayyaz first argues that he has "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). Under the ADA, "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, … learning, reading, concentrating, thinking, communicating, and working." *Id.* § 12102(2)(A). The "operation of a major bodily function, including … neurological [and] brain … functions" is also a major life

12

activity under the statute. *Id.* § 12102(2)(B). The EEOC's regulations interpreting the ADA instruct that "the term 'substantially limits' shall be construed broadly" and "is not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(1)(i). In this context, the Court defers to the EEOC's regulations unless they are "arbitrary, capricious, or manifestly contrary to the statute." *Richardson v. Chicago Transit Auth.*, 926 F.3d 881, 887 (7th Cir. 2019) (quoting *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984)).

It is undisputed that Fayyaz was involved in a car accident, suffered a concussion, and was diagnosed with post-concussion syndrome. DSOF ¶ 17; PSOAF ¶¶ 8–9. Neither party denies that Fayyaz experienced headaches and had trouble with his vision, hearing, and concentration—all resulting from the accident. DSOF ¶¶ 17, 50, 51; PSOAF ¶ 13. And although UHS contests whether his symptoms are "medical problems," *see* Def's Resp. PSOAF at 9, the Defendants concede that Fayyaz reported experiencing these complications every day after the accident. *Id.*; PSOAF ¶ 14. UHS argues that Fayyaz never notified UHS about his symptoms, continued to work at UHS, and never requested an accommodation. *See* Defs.' Reply at 8. Given the requirement of viewing the evidence in Fayyaz's favor at this stage, none of those facts would prevent a jury from simply crediting Fayyaz's testimony about the symptoms.

The relevant question is not if Fayyaz experienced lingering symptoms, but whether Fayyaz was substantially limited by these "flare-ups" during the time period around the firing. It is true that the Seventh Circuit has held that *infrequent* flare-ups do not render a condition a disability. *Moore v. J.B. Hunt Transp., Inc.*, 221 F.3d

13

944, 952 (7th Cir. 2000) (holding that infrequent "flare-ups" of plaintiff's rheumatoid arthritis, occurring one or two times a year, did not equate to a "disability" under the ADA). But there is no evidence in the record to suggest that Fayyaz's symptoms were infrequent. According to a January 7, 2019, medical exam—just two days before Fayyaz was fired—Fayyaz reported experiencing headaches about three times *per week*. PSOAF ¶ 20. Fayyaz also avers in his declaration that he "continue[s] to suffer from many of the same symptoms," including headaches, photosensitivity, and dizzy spells two-to-three times a month. Fayyaz Decl. ¶¶ 4–6. A jury can readily find that these neurological symptoms substantially limited Fayyaz's ability to see, concentrate, think, and work, which are all major life activities. 42 U.S.C. § 12102(2)(A)

The Defendants accurately point out that evidence of Fayyaz's *current* symptoms (which appear to be less frequent than before) are not necessarily dispositive to showing the frequency of his symptoms at the time of termination. *See* Defs.' Reply at 8. Yet Fayyaz never draws a direct line between the *frequency* of his current symptoms with his previous ones—he says only that he suffers the *same* symptoms. Fayyaz Decl. ¶ 4. It would be one thing if he explicitly stated in his declaration or deposition that his condition alleviated over time and became less frequent. But he does not do this. When construing the evidence in light most reasonable to the plaintiff, as the Court is obligated to do, a reasonable jury could easily find Fayyaz's limitations to be substantial at the time of his termination. *See E.E.O.C. v. AutoZone, Inc.*, 630 F.3d 635, 642 (7th Cir. 2010) (holding flareups four to five times a week was sufficient for a reasonable jury to find substantial limitation); *E.E.O.C. v. Sears, Roebuck & Co.*,

14

233 F.3d 432, 439 n.4 (7th Cir. 2000) (holding "a predictable yet intermittent pattern" of impairment was sufficient to survive a motion for summary judgment). Fayyaz has enough evidence to establish that he suffered from a disability at the time of the firing.

### 2. Qualified / Job Performance

Moving on to the second element of the ADA claim, Fayyaz must offer enough evidence that he was qualified to perform his job. *Igasaki,* 988 F.3d at 961. Aside from a few exceptions not relevant here, the ADA defines the term "qualified individual" to mean "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *see Kotaska v. Fed. Express Corp.*, 966 F.3d 624, 628 (7th Cir. 2020). This means that the employee must show that he was qualified for the job and was "capable of performing the job's essential functions with or without reasonable accommodation from an employer." *Brumfield v. City of Chicago*, 735 F.3d 619, 632 (7th Cir. 2013) (cleaned up); *see also* 29 C.F.R. § 1630.2(m).

Fayyaz principally argues there is no evidence that, after returning from FMLA leave, he was physically unable to perform the essential functions of his position. *See* Pl.'s Br. at 10. Unfortunately, Fayyaz must do more than prove his physical capabilities. The Court may consider an employee's "poor attitude, careless behavior, and deficient work performance" when determining whether the employee is qualified under the ADA. *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 862 (7th Cir. 2005); *see Budde v. Kane Cnty. Forest Pres.*, 597 F.3d 860, 862 (7th Cir. 2010) (holding

15

that the plaintiff's drunk driving was evidence that he was not qualified to serve as police chief). In *Hammel*, the Seventh Circuit held that the employee's insubordinate behavior, disregard for direct orders, and lack of respect for his supervisor's directions disqualified him on grounds that he was a "troubled, confused and unsuitable employee, not a disabled one." 407 F.3d at 864. Hammel failed to demonstrate that he could perform the essential functions of his job in a manner befitting his employer's "legitimate business expectations." *Id.*

Here, as UHS correctly asserts, Fayyaz does not dispute several instances of his poor attitude, careless behavior, and deficient work performance. He admits, for example, that he grew "more argumentative, defensive" and distanced himself from The Joint Commission issue during the January 9, 2019 meeting with Airhart. Pl.'s Resp. DSOF ¶ 43. Fayyaz also concedes that Simko, a witness to the January 9 meeting, remembers that Fayyaz's attitude was "so nonchalant, disrespectful, and insubordinate that she was 'taken aback' by it." *Id.* ¶ 47; *see* Simko Dep. at 147:13–150:7, 17–24, 152:14–19, 178:18–179:20, 186:2–187:7.

In response, Fayyaz contends that he did not suffer from workplace-performance issues, pointing to the meets-expectations rating he received in February 2018 and the fact that he received a merit raise. *See* Pl.'s Br. at 10; PSOAF ¶¶ 5, 7. But the record evidence shows that Fayyaz's performance was poor several months *after* the rating and several months before the January termination. In October 2018, the night of Hartgrove's tri-annual TJC survey, Airhart observed that Fayyaz had a "miserable … filing system" and that his department was "ill prepared" and "disorganized."

16

Case: 1:20-cv-01570 Document #: 51 Filed: 03/31/22 Page 17 of 29 PageID #:682

Pl.'s Resp. DSOF ¶ 21. One month later, Airhart met with Fayyaz to express Airhart's frustration about his department's lack of readiness for The Joint Commission survey. *Id.* ¶ 35. And just three days before Fayyaz's firing, Airhart told him and others that "he was stunned to see so many files still appearing to be grossly deficient" and that he (Airhart) expected full compliance—specifically from Fayyaz. *Id.* ¶ 38. The collection of these undisputed behavioral and performance issues is sufficient to show that Fayyaz was performing up to UHS' legitimate expectations. *See Graham v. Arctic Zone Iceplex, LLC*, 930 F.3d 926, 929 (7th Cir. 2019) ("[E]ven minor grievances can accumulate into a record that justifies termination."). This alone is sufficient to grant UHS summary judgment on the ADA discrimination claim.

For completeness' sake, it is worth discussing the third element of the discrimination claim. Fayyaz must show a genuine issue of material fact exists on whether his disability was the "but for" reason for his termination. *Monroe v. Indiana Dep't of Transportation*, 871 F.3d 495, 504 (7th Cir. 2017). The deciding question, in other words, is "could a reasonable juror conclude that he would not have suffered the same adverse employment action if he were not disabled and everything else had remained the same?" *Kurtzhals v. Cty. of Dunn*, 969 F.3d 725, 729 (7th Cir. 2020).

As proof that his disability was the but-for cause of the termination, Fayyaz cites the same two points that the Court has already examined and rejected: (1) the meets-expectation rating; and (2) the timing between the termination and the request for more FMLA leave. Pl.'s Br. at 10. To repeat, on the first point, Fayyaz's performance in 2017 has little relevance to his performance in 2018.

17

On the second point, it is true the "temporal proximity" of an employee's termination with some disability-related event can help prove discriminatory intent based on disability. *Magnus v. St. Mark United Methodist Church,* 688 F.3d 331, 338 (7th Cir. 2012). But "suspicious timing alone is rarely enough to survive summary judgment" especially when "there are reasonable, non-suspicious explanations for the timing of the termination." *McCann v. Badger Mining Corp.*, 965 F.3d 578, 592 – 93 (7th Cir. 2020). Here, UHS provided legitimate, non-discriminatory reasons for its actions. Fayyaz does not dispute the nonchalance and disrespect he showed after being confronted, in the January 2019 meeting, with multiple problems related to his workplace performance. Pl.'s Resp. DSOF ¶ 43. Also, as related to timing, Fayyaz concedes that the decision to demote him for poorly performing on the January 8 mock survey was made *before* the decision to fire him. *See id.* ¶ 40. Put another way, the January 9 meeting was originally set to *demote* Fayyaz, not to terminate him, and the record evidence corroborates that it was Fayyaz' behavior *during* the January 9 meeting that caused his termination. *See id.* ¶¶ 41–42. What's more, the absence of evidence that the Fayyaz requested the additional FMLA leave on January 8, *see supra* § III, as opposed to some earlier date in November or December 2018, casts even more doubt on any temporal-proximity inference.. All this leads the Court to hold that a reasonable jury would have no choice but to reject the but-for causation contention. Summary judgment against the ADA claim is thus granted.

18

**B. FMLA Claim**

Next, Fayyaz claims that UHS retaliated against him for seeking intermittent leave under the Family and Medical Leave Act. The FMLA prohibits employers from "retaliating against an employee that exercises or attempts to exercise FMLA rights." *Pagel v. TIN, Inc.*, 695 F.3d 622, 631 (7th Cir. 2012) (citing 29 U.S.C. § 2615(a)(2)). To win on a retaliation claim under the FMLA, the employee must show that "(1) he engaged in a statutorily protected activity; (2) the employer took an adverse employment action against the employee; and (3) the protected activity caused the adverse action." *Freelain v. Vill. of Oak Park*, 888 F.3d 895, 901 (7th Cir. 2018) (cleaned up). Adverse actions are, relatively speaking, broadly defined for retaliation purposes: "Materially adverse actions are *not* limited to employment-related activities but include any actions that would dissuade a reasonable employee from exercising his rights under the FMLA." *Breneisen v. Motorola, Inc.,* 512 F.3d 972, 979 (7th Cir. 2008) (emphasis added) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006)). The correct legal standard is whether the evidence as a whole would permit a reasonable factfinder to conclude that the plaintiff's protected activity caused the discharge or adverse action. *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016).

Here, the first two elements are undisputed. Fayyaz engaged in statutorily protected activity by pursuing FMLA leave from September to November 2018. DSOF ¶¶ 19, 34; PSOAF ¶ 11. He requested additional FMLA leave "shortly after" returning to work in November 2018. *See* DSOF ¶ 62. Fayyaz also faced an adverse

19

employment action on January 9, 2019, when he was terminated from his position at UHS. *Id.* ¶ 44.[7]

On the final element, causation can be established under either the direct or the indirect method of proof. *Nicholson v. Pulte Homes Corp.*, 690 F.3d 819, 828 (7th Cir. 2012).[8] Under the direct method, the plaintiff presents evidence that the employer "intended to punish [the employee] for requesting or taking FMLA leave." *Id.* Alternatively, the plaintiff can "try to prove retaliatory intent indirectly by showing that [he] was performing [his] job duties satisfactorily but was treated differently from similarly situated employees who did not request FMLA leave." *Id.* Fayyaz need not prove that retaliation was the only reason for the termination; he may establish an FMLA retaliation claim by "showing that the protected conduct was a substantial or motivating factor in the employer's decision." *Lewis v. Sch. Dist. #70*, 523 F.3d 730, 741–42 (7th Cir. 2008) (cleaned up).

Fayyaz does not present evidence under the indirect method, so the Court will consider evidence concerning whether Airhart intended to punish Fayyaz for requesting or taking FMLA leave. To begin, Fayyaz mistakenly argues that suspicious timing

---

[7]The Seventh Circuit recognizes demotions as adverse employment actions. *See e.g.*, *Lewis v. Sch. Dist. #70*, 523 F.3d 730 (7th Cir. 2008) (denying summary judgment in FMLA retaliation claim where plaintiff showed job performance unrelated to her absenteeism justified her demotion). Fayyaz, however, never discusses his demotion in relation to his FMLA claim. Instead, he alleges only that Airhart fired him due to his request for FMLA leave. *See* Fayyaz Decl. ¶ 7; PSOAF ¶¶ 30–31. So the Court focuses on Fayyaz's termination as the adverse employment action at issue.

[8]The Court notes that, consistent with Seventh Circuit precedent, direct and indirect evidence are *not* subject to different legal standards. *Ortiz*, 834 F.3d at 765; *see Huff v. SOS Children's Villages, Illinois*, 2021 WL 1172655, at *8 (N.D. Ill. Mar. 29, 2021).

alone is sufficient to establish causation. *See* Pl.'s Br. 12. This is not entirely right. Similar to the ADA temporal-proximity element discussed earlier, "suspicious timing by itself rarely is enough to overcome summary judgment." *Lutes v. United Trailers, Inc.*, 950 F.3d 359, 369 (7th Cir. 2020) (affirming grant of summary judgment for the employer against an FMLA retaliation claim on this basis). Yes, suspicious timing alone can be enough—but "rarely." *Id.* Given the earlier discussion of when Fayyaz requested FMLA leave, *see supra* § III, something on the scale of several weeks, rather than days, passed between the request for more leave and the January 9 firing.

Having said that, Fayyaz does offer other pieces of circumstantial evidence from which retaliation can reasonably be inferred. Pl.'s Br. at 12–13. First, it is undisputed that the UHS executive team bet on whether Fayyaz would return from his FMLA leave. PSOAF ¶¶ 25–26; DSOF ¶ 31. UHS attempts to parse whether the bet was "official" or "unofficial," but either way, animus against taking the FMLA leave can be inferred from that FMLA-adverse conduct. *See* Defs.' Resp. PSOAF ¶ 26. What would an "official" bet on this even look like? No, an employer need not create "official" gambling odds and betting lines on an employee's return from FMLA leave before the evidence can be considered as animus against that leave. Worse, Airhart—the decisionmaker in this case—concedes that he was aware of "unofficial wagering" between members of Fayyaz's team on whether Fayyaz would return to work. Airhart Dep. 173:1–5. Although Airhart contended that he would not have condoned an "actual bet," the record says nothing about whether he attempted to *stop* these anti-leave discussions or criticized anyone for doing so. *Id.* at 173:1–16. In fact, he explicitly

21

revealed to Fayyaz that these discussions were ongoing. PSOAF ¶ 25. When viewing this evidence in light most favorable to Fayyaz, a reasonable jury may infer that Airhart knew about yet overlooked these pejorative comments among his "very cohesive, close team," Airhart Dep. at 172:8—and then disclosed the comments to Fayyaz in order to deter him from seeking further leave.

Second, there are genuine disputes of fact over whether—shortly before his FMLA leave ended—Airhart called Fayyaz an "embarrassment" and stated that the company would have to go in a "different route" if Fayyaz was unable to come back earlier than his leave allowed. DSOF ¶¶ 32–33; PSOAF ¶ 24. UHS asserts that this evidence is "immaterial" because Fayyaz withdrew his FMLA-interference claim. Defs.' Reply at 15. But if those statements were made, then they do qualify as evidence of *retaliatory* animus separate from any poor-performance issues in Fayyaz's work.

Likewise, and finally, the parties contest when and if Airhart responded "oh, shit" to Fayyaz's request for additional FMLA leave. DSOF ¶ 63; PSOAF ¶ 30; Defs.' Resp. to PSOAF ¶ 30. It is true that, as explained earlier, Fayyaz's contention that it was the day right before the termination cannot be considered. *Supra* § III. But even if Airhart made this statement shortly after Fayyaz returned from FMLA leave sometime in November 2018, it still supports an inference that Airhart was frustrated at

22

Fayyaz's request to take more FMLA leave, and is thus relevant to the retaliation claim.[9]

To be sure, typically summary judgment is granted in the employer's favor "where the employer provides undisputed evidence that the adverse employment action is based upon the employee's poor job performance." *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 221 (7th Cir. 2015). And Fayyaz must "present other evidence that the employer's explanation for the adverse action was pretext for retaliation." *Tibbs v. Admin. Off. of the Ill. Cts.*, 860 F.3d 502, 505 (7th Cir. 2017) (cleaned up).

This is one of those relatively rare cases in which the employee is able to offer enough evidence of pretext as to one form of motivation—FMLA retaliation—but not enough as to another form of motivation—disability discrimination, as discussed earlier. Here, the facts in their totality on the FMLA retaliation are sufficient to show pretext. *See e.g., Ricco v. Sw. Surgery Ctr., LLC*, 73 F. Supp. 3d 961, 972 (N.D. Ill. 2014) (denying summary judgment against FMLA claim where the employee offered evidence that the justification for her termination was pretextual). In other words, Fayyaz has enough evidence that the assertions about his attitude during the January 9 meeting was pretext for FMLA retaliation—but not pretext for disability discrimination. A reasonable factfinder can conclude that Airhart was motivated by his

---

[9]Fayyaz also asserts that UHS never followed progressive discipline in firing him. PSOAF ¶ 32. In response, UHS contends that Fayyaz, as an executive team member, was exempt from this policy and that the policy itself is not binding. Defs.' Resp. PSOAF ¶ 32. The undisputed evidence establishes the inapplicability of the policy, so Fayyaz's point is rejected.

frustration with Fayyaz at taking continued FMLA leave. And remember that an FMLA retaliation claim does not require but-for causation (unlike an ADA discrimination claim). Fayyaz need not show retaliatory animus "amount[s] to a but-for factor or to the only factor, but is rather *a* factor that motivated the defendant's actions." *Lewis*, 523 F.3d at 741–42 (emphasis added). Under this standard, Fayyaz has presented sufficient evidence to show that his participation in and request for FMLA leave was a motivating factor in the termination. The retaliation claim survives summary judgment.

### C. After-Acquired Evidence

The final issue is whether after-acquired evidence concerning Fayyaz bars damages for certain time periods after his firing. Defs.' Br. at 14–15. Under this defense, after-acquired evidence of an employee's misconduct may impose a limit on damages. *See McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 361–362 (1995). When an employer finds "evidence of employee wrongdoing which would have led to the employee's discharge," then the employee's backpay damages is capped "to the period before the discovery of this after-acquired evidence." *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1047 (7th Cir. 1999); *see also Rooney v. Koch Air, LLC*, 410 F.3d 376, 382 (7th Cir. 2005). Contrary to Fayyaz's contention that the after-acquired evidence defense is reserved solely for the jury, *see* Pl.'s Br. at 14,[10] the Court may decide the

---

[10]Fayyaz cites *Ortiz* for this proposition, 834 F.3d at 767, but all *Ortiz* held on this point is that there were "conflicting accounts" sufficient to require a jury decision on the defense. *Ortiz* did not hold that the after-acquired evidence defense is not subject Rule 56 summary judgment motions. Indeed, the Seventh Circuit was not even directly presented with

issue here. *See e.g., Turner v. Am. Bottling Co.*, 2019 WL 932017, at *8 (N.D. Ill. Feb. 26, 2019) (denying after-evidence doctrine argument at summary judgment "because there are genuine disputes in the record"); *Mabins v. AEP NVH OPCO, LLC,* 2018 WL 1397426, at *8 (N.D. Ill. Mar. 20, 2018) (holding evidence is "too thin to support summary judgment on the after-acquired evidence defense").

UHS asserts that Fayyaz would have been discharged on two grounds. First, in or around February 2019, Fayyaz failed to issue consent waiver forms under the Illinois Biometric Information Privacy Act (BIPA) to UHS employees despite being instructed to do so. Defs.' Br. at 14–15; Defs.' Reply at 15. Second, during this lawsuit, UHS discovered that Fayyaz misrepresented his employment history on his job application before being hired. *Id.*

On the BIPA-form point, it is undisputed that in February 2019, Polly Costantini of UHS's corporate department sent a calendar invitation to Fayyaz for a conference call on BIPA mandates and regulations. Pl.'s Resp. DSOF ¶ 70. During the call later that month, Costantini explicitly instructed HR leaders—which included Fayyaz—that their respective hospitals needed to adopt and implement policies and procedures for issuing BIPA consent-waiver forms. *Id.* ¶ 71. Failure to do so, Costantini explained, would pose liability risks to UHS. *Id.*; *see* Costantini Decl. ¶ 5. Despite this, Fayyaz agreed that he had "absolutely no knowledge of the BIPA, including what

the question of whether there even is a right to a jury on the after-acquired evidence defense. Typically, in employment discrimination cases, backpay is considered an equitable determination for the court, not the jury, to make.

its requirements are, and that he has absolutely no recollection of attending the mandatory [February] conference call with Costantini, though he admits he was on the Outlook invite." *Id.* ¶ 72. Fayyaz further concedes that he did not remember whether he ever issued any consent-waiver forms to UHS employees. *Id.* Consequently, BIPA policies and procedures were not implemented and adopted by Fayyaz nor were employee consent-waiver forms issued. *Id.* ¶ 73–74. This resulted in Garfield Park Hospital facing multiple class-action claims. *Id.* ¶ 75. UHS asserts it would have terminated Fayyaz when it discovered these errors in February 2019. DSOF ¶ 76; *see* Airhart Decl. ¶ 11.

Fayyaz's only response to this is that the scenario is a hypothetical and thus speculative. Pl.'s Resp. DSOF ¶ 76. But the after-acquired evidence doctrine inherently calls for hypothesizing. The relevant standard is not whether further evidence of employee wrongdoing actually led to Fayyaz's termination—by definition it did not—instead, UHS need only show the evidence "*would have* led to the [Fayyaz's] discharge." *Sheehan*, 173 F.3d at 1047 (emphasis added). It is true that UHS would have an even stronger case if it could show it had an actual employment practice of firing workers with analogous situations to Fayyaz. *See Roadway Exp., Inc. v. U.S. Dep't of Lab.*, 612 F.3d 660, 666 (7th Cir. 2010). But this evidence is not required in every case. In *Cuff v. Trans States Holdings, Inc.*, the Seventh Circuit rejected the conclusion that evidence of employee's misconduct would be inadmissible "unless [the defendant] could show that they had fired another worker for doing exactly what they belatedly learned" about the plaintiff. 768 F.3d 605, 609 (7th Cir. 2014). There, the

26

employer discovered evidence that the plaintiff was sexually involved with a subordinate, lied about the relationship during an internal investigation, failed to report a DUI, and took several narcotic drugs that rendered him unfit for work. *Id.* No comparator was needed. Similarly, here Fayyaz actually offers no substantive response to the seriousness of the risk posed by BIPA class actions (BIPA allows for statutory damages for each violation). Despite receiving an explicit directive to obtain consent-waiver forms, and explicit explanation of its importance, Fayyaz did nothing in response. UHS is entitled to summary judgment on the after-acquired evidence defense, specifically, that Fayyaz's backpay must be cut-off as of March 1, 2019.

The Defendants' second rationale on Fayyaz's resume misrepresentations is less persuasive. Not every resume misrepresentation limits backpay damages. *O'Neal v. City of New Albany*, 293 F.3d 998, 1004 (7th Cir. 2002); *see Lalowski v. Corinthian Sch., Inc.*, 2013 WL 1788353, at *9 (N.D. Ill. Apr. 26, 2013) ("Defendants here do nothing more than assert Lalowski would have been fired after they discovered he failed to include all his employers on his resume."). To be sure, it is undisputed that Fayyaz's employment application was not entirely accurate. Pl.'s Resp. to DSOF ¶ 68. Instead of disclosing that he was employed for RehabCare Group East, Inc., Fayyaz only represented that he was employed for Kindred Healthcare. *Id.* ¶ 66. Specifically, UHS contends that Fayyaz failed to disclose that he in fact had been fired by RehabCare, which in turn would be a terminable offense from UHS and stop backpay damages as of March 3, 2020 (when UHS uncovered the omission). DSOF ¶¶ 68–69.

27

These arguments are unpersuasive. As Fayyaz accurately points out, Hart-grove's Employee Handbook says that omitting or providing misleading information on a job application "may" lead to termination. Pl.'s Resp. DSOF 69; R. 41-22, Defs.' Exh. C, Corrective Action Policy. "May" implies discretion rather than an absolute rule of firing all employees for resume omissions. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 844 (2018). Absent evidence that UHS has fired employees that made mis-representations on their employment application in situations analogous to Fayyaz, summary judgment on this version of the after-acquired evidence defense is rejected. As a practical matter, though, the BIPA-form basis for the defense cuts off damages even earlier than this version of the defense would have.

## V. Conclusion

UHS's motion for summary judgment is granted as to the ADA disability-dis-crimination claim. The motion is denied as to the FMLA retaliation claim. Summary judgment is also granted insofar as backpay damages are capped as of March 1, 2019, given the after-evidence defense. With the summary judgment decision in place, the parties shall promptly begin settlement negotiations. The status hearing of April 8, 2022, is reset to April 29, 2022, at 8:30 a.m., but to track the case only (no appearance is required). Instead, the parties shall file a status report by April 22, 2022, reporting

on the status of settlement discussions and on whether they want a settlement refer-

ral to the magistrate judge.

                                            ENTERED:


                                            _____s/Edmond E. Chang_____
                                            Honorable Edmond E. Chang
                                            United States District Judge

DATE: March 31, 2022